IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Bill Martin, John Burks, Betty Boze, | ) | |
| Essie Lee Kelly, Brian Holt, and | ) | |
| Barbara Parham, | ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) | 1:05 CV 0835 - CC |
| | ) | |
| v. | ) | JURY TRIAL |
| | ) | REQUESTED |
| Bio-Lab, Inc., Great Lakes Chemical | ) | |
| Corporation, Gallagher Bassett | ) | |
| Services, Inc., Chemtura Corp., | ) | |
| and Larry Bloom, | ) | |
| | ) | |
| Defendants. | ) | |

**THIRD AMENDED CLASS ACTION COMPLAINT
FOR DAMAGES AND FOR DECLARATORY JUDGMENT**

NOW INTO COURT, through undersigned counsel, come Plaintiffs Bill

Martin, John Burks, Betty Boze, Essie Lee Kelly, Brian Holt, and Barbara Parham,

who respectfully represent on their own behalf, and on behalf of all others similarly

situated, as follows:

PARTIES

1.  The following are the parties to this action:

a)  Plaintiff Bill Martin (hereinafter "Martin"), is an individual over nineteen (19)

years of age and a resident citizen of Newton County, Georgia.  Martin conducts

business in Conyers, Georgia under the name of Martin's Auto Repair, which

business suffered lost profits and other damages as a result of the incident complained of herein;  Martin has also suffered damage to personal property and personal injury, as set forth in more detail below;

b)  Plaintiff, John Burks, (hereinafter "Burks"), is a person of the full age and a resident citizen of Rockdale County, Georgia;

c)  Plaintiff, Betty Boze, (hereinafter "Boze"), is a person of the full age and a resident citizen of Walton County, Georgia;

d)  Plaintiff, Essie Lee Kelly, (hereinafter "Kelly"), is a person of the full age and a resident citizen of Rockdale County, Georgia;

e)  Plaintiff, Brian Holt, (hereinafter "Holt"), is a person of the full age and a resident citizen of Rockdale County, Georgia;

f)  Plaintiff, Barbara Parham, (hereinafter "Parham"), is a person of the full age and a resident citizen of Rockdale County, Georgia;

g)  Defendant Bio-Lab, Inc., (hereinafter "Bio-Lab" or "BioLab"), is a Delaware corporation, licensed to do business in the State of Georgia, and conducting business in several counties in the State of Georgia, including Rockdale County; at the time of the events at issue, Bio-Lab was a wholly owned subsidiary of defendant Great Lakes Chemical Corporation.  Presently, Bio-Lab is a wholly owned subsidiary of defendant Chemtura Corporation.

2

h)  Defendant Great Lakes Chemical Corporation, (hereinafter "Great Lakes"), is or was a Delaware corporation, with its principal place of business in Indiana.

i)  Chemtura Corporation (hereinafter "Chemtura") is the successor of Great Lakes. It is a Delaware corporation, with its principal place of business in Connecticut.  It may be served at Corporation Service Company, 40 Technology Pkwy. South, # 300, Norcross GA 30092.

j)  Defendant Gallagher Bassett Services Inc., (hereinafter "Gallagher Bassett") admits that it is a foreign corporation with its principal place of business in a state other than Georgia.  Doc. No. 127, p. 6, ¶ 2.  Gallagher Bassett is a citizen of, and is incorporated in, Delaware, and its principal place of business is in Illinois.

k)  Defendant Larry Bloom (hereinafter "Bloom") is a person of the full age and a resident citizen of Fulton County, Georgia.

<u>JURISDICTION OF THE COURT</u>

2.  Jurisdiction of this action is based upon 28 U.S.C. § 1332, as amended by the "Class Action Fairness Act of 2005."  At least one plaintiff and one defendant are from different states, creating minimal diversity.  The matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. All named plaintiffs and more than two-thirds of the members of the class are citizens of the State of Georgia.  The total number of members of the class exceeds one hundred persons.

3

3.   A primary defendant, Great Lakes (succeeded by Chemtura), is not a citizen of the State of Georgia.  Another primary defendant, Gallagher Bassett, is not a citizen of the State of Georgia.

4.   During the three-year period preceding the filing of this class action, five class actions have been filed arising out of the same incident, asserting the same or similar factual allegations against one or more of the Defendants herein on behalf of a class of plaintiffs defined similarly to the one described herein.

<u>ALLEGATIONS FOR CLASS CERTIFICATION</u>

5.   Plaintiffs bring this action on their own behalf and on behalf of all persons, corporations, firms or entities similarly situated.  This action should be certified as a class action pursuant to Fed.R.Civ.P. Rule 23, for the following reasons.

6.   The class is so numerous that joinder of all members is impracticable. Thousands of people were adversely affected by the explosion and fire at Bio-Lab's facility in Conyers, Georgia on and after May 25, 2004.  They suffered damages in the past and/or into the foreseeable future, including personal injuries, emotional distress, fear and fright, evacuation and inconvenience, property damage, loss due to negligent or mistaken claims processing and check issuance, loss due to fraud, special damages for past and future loss of income, special damages for business interruption, special damages for out-of-pocket expenses, special damages for past

4

and future cost of medical care and diagnostics, including medical monitoring in the future for latent diseases. A mass joinder of that many plaintiffs would be impracticable to manage by the Court and by counsel.

7. In accordance with Local Rule 23.1(A)(2)(d), the following issues of fact are common among members of the class:

a) the cause and origin of The Fire at Defendants' warehouse;

b) whether there were violations of relevant fire codes, statutes, rules and regulations;

c) whether Defendants failed to supervise, train and otherwise manage employees handling dangerous chemicals;

d) whether Defendants inadequately and/or improperly stored dangerous chemicals;

e) whether Defendants failed to inspect dangerous chemicals;

f) whether Defendants failed to implement safe chemical handling procedures;

g) whether  Defendants failed to promptly notify emergency personnel regarding an incident and to mitigate, evacuate, warn and otherwise preventing The Fire at issue from becoming a catastrophic event;

h) whether the Defendants' solicitation, processing, and purported settlement and release of claims related to The Fire was negligent, mistaken, and/or fraudulent;

i)  whether Defendants' breach of duty was willful and/or wanton and/or in bad faith;

j)  the general causation of damages suffered by plaintiff class;

k)  the necessity for, and extent of, an evacuation of the surrounding community;

l)  the general health effects of exposure to the toxic chemicals released in The Fire;

m)  the necessity for and extent of medical monitoring for the class;

n)  quantum of punitive damages owed by Defendants to the Class;

o)  quantum of Plaintiffs' attorneys fees owed by Defendants to the Class.

8.  In accordance with Local Rule 23.1(A)(2)(d), the following issues of law are common among members of the class:

a)  what are Defendants' legal duties with regard to preventing and/or mitigating The Fire;

b)  what is the legal standard for determining Defendants' negligence;

c)  what is the legal standard for determining whether defendants are strictly liable;

d)  what is the legal standard for determining whether defendants are liable for nuisance;

e)  what is the legal standard for determining whether Defendants are liable for trespass;

f)  whether O.C.G.A. § 13-5-4 prohibits enforcement of certain checks as a release,

6

partial release, and/or release to the extent of the amount of each check;

g) whether checks evidencing a mutual mistake may be reformed for, and/or incidental monetary relief awarded to, a sub-class under Fed.R.Civ.P. 23(b)(2);

h)  what is the legal standard for determining whether Defendants are liable for attorneys fees;

i)  what is the legal standard for the imposition of punitive damages in this case;

j)  what is the legal standard for proper claims settlement procedures, and/or for soliciting releases of claims which require the releasing parties, without first being informed of a right to the advice of attorneys or physicians, to make general waivers of claims for injuries the nature and severity of which are unknown or unknowable to the releasing parties at the time the releases are solicited;

k)  whether the Defendants may be required to pay for the future cost of medical care, diagnostics and/or medical monitoring;

l)  any other issues of law implicit in the foregoing common issues of fact.

9.  The claims of the representative parties are typical of the claims of the Class.  The representative parties herein collectively have suffered at least one of each category of damages suffered by the Class as a whole, namely, damages in the past and/or into the foreseeable future, including personal injuries, emotional distress, fear and fright,  evacuation and inconvenience, property damage, loss due

to negligent or mistaken claims processing, loss due to fraud, special damages for past and future loss of income, special damages for business interruption, special damages for out-of-pocket expenses, special damages for past and future cost of medical care and diagnostics, including medical monitoring in the future for latent diseases.

10.   The representative plaintiffs will fairly and adequately protect the interests of the Class. None of them have any relationship with the Defendants in this case. Undersigned counsel for the representative plaintiffs will vigorously prosecute this action on behalf of the entire Class. Undersigned counsel are knowledgeable and experienced in the substantive and procedural issues raised by class litigation following mass disasters, they will protect the interests of the entire Class, and they are willing to commit the financial resources to prosecute this action on behalf of the entire Class.

11.   The Class may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the Class for purposes of the conclusiveness of any judgment that may be rendered in the case.  This action resulted from a single incident, the harmful effects of which may be objectively defined and identified by the court. Until the time that a more precise geographic location can be identified, the Class of persons sought to be represented herein

consists of all persons, corporations, firms or entities who suffered damages as a result of The Fire at the Bio-Lab warehouse in Conyers, Georgia on and after May 25, 2004, who or which were located within the town of Conyers, Georgia, and thence in a general northeast direction an approximate distance of 45 miles from the site of The Fire.

12.  The prosecution of separate actions by individual members of the class would be impracticable and would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, and which would establish incompatible standards of conduct for the Defendants herein.

13.  Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or will substantially impair or impede their ability to protect their interests, especially as it concerns the common issues identified above.

14.  The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. For those plaintiffs with relatively small claims, it would be extremely difficult to prosecute their claims on their own. The enormous cost of proving the common issues of Defendants' liability for compensatory and punitive

damages, quantum of punitive damages, and general causation would be prohibitive for the individual claimant.

<u>ALLEGATIONS OF FACT COMMON TO ALL COUNTS</u>

15. Great Lakes, through its Bio-Lab subsidiary, was one of the world's largest manufacturers of water treatment products for swimming pools and spas, cooling towers, fountains, and other water systems. These products were and are sold to residential and commercial pool and spa owners through a Bio-Lab dealer network, mass retailers, and pool and spa professionals through Bio-Lab distributors worldwide.

16. Great Lakes, through its Bio-Lab subsidiary, owned and operated a large facility at 1739 Dogwood Dr., Conyers, Georgia, at which pool and spa chemicals were and are processed, packaged and stored. Some of the chemicals which Bio-Lab used (and uses), processed (and processes), and stored (and stores) at this facility are trichloroisocyanuric acid, dichloroisocyanuric acid, and calcium hypochlorite, all of which are highly toxic, highly volatile, ultra-hazardous materials.

17. Chemtura, as Great Lakes' successor, presently owns and operates BioLab as a wholly owned subsidiary. Chemtura, as Great Lakes' successor, continues the operations of Great Lakes and the Conyers facility at which The Fire occurred. Chemtura is the creation of a merger of Great Lakes with another corporation. It

exists only because of that merger.

18.  At approximately 4:30 a.m. on May 25, 2004, a fire broke out at Building No. 14 of Bio-Lab's warehouse complex in Conyers.  On information and belief, there were approximately 15 million pounds of calcium hypochlorite, trichloroisoeyanuric acid, dichloroisocyanuric acid, along with numerous other toxic and/or combustible materials in the warehouse at the time. On information and belief, this warehouse contained a water sprinkler system, purporting to comply with minimum fire code requirements, that was totally inadequate and inappropriate to deal with a fire involving the substantial quantity of ultra-hazardous materials stored at the facility.

19.  On information and belief, calcium hypochlorite, trichloroisoeyanuric acid, and dichloroisocyanuric acid have a well known history of hyper-reactivity to contaminants, which may result in a strongly exothermic reaction. When exposed to such contaminants, or when exposed to sufficient heat, calcium hypochlorite, trichloroisoeyanuric acid, and dichloroisocyanuric acid will cause and/or violently accelerate combustion, creating its own oxygen, until the fuel is completely consumed.

20. On information and belief, the calcium hypochlorite, trichloroisoeyanuric acid, dichloroisocyanuric acid, other toxic chemicals and combustibles stored in the

warehouse burned in an uncontrollable inferno from approximately 4:30 a.m., on May 25 through the evening of May 26, 2004. The Fire produced huge cloud of smoke and fumes that contained pyrogenic byproducts created by the decomposition and burning of chemicals and other combustible materials, including chlorine gas, and other highly dangerous, toxic chemicals.

21.  On information and belief, after The Fire started, the Rockdale County Sheriff and Conyers Police Departments ordered an evacuation of all people within a two-mile radius of The Fire. As a result, thousands, of people were rousted from their homes and businesses and could not return for one or more days.

22.  On information and belief, during the time of The Fire, the prevailing wind carried a plume of toxic smoke and fumes at least forty-five miles from the Bio-Lab warehouse in a general northeasterly direction through Rockdale, Newton, Walton, Morgan, Greene, and Putnam Counties, Georgia, causing damage to persons, property, plants and animals in its path.

23.  On information and belief, for several months after the time of The Fire, Bio-Lab released from the site of The Fire toxic fumes into the air, as well as toxic fluids into the ground, streams and water table surrounding the warehouse, causing damage to persons, property, plants and animals in their path.

24.  Upon information and belief, Bio-Lab and Defendants Bloom and Great

12

Lakes had previously been warned and received notice regarding its improper storage, processing, manufacturing and handling of chemicals at its facility and the possibility that such unsafe practices could result in explosions, fire and harm to the surrounding community.  On April 1, 2004, the local fire department responded to a hazardous materials release which resulted in a fire at Bio-Lab Plant 2 and personal injuries to persons nearby.  The chemical fire was caused by the negligent handling and mismanagement of incompatible materials.  Likewise, upon information and belief, The Fire that occurred at the Bio-lab facility on May 25, 2004 was caused, in part, by the improper handling and mismanagement of dangerous chemicals.  However, unlike the April 1, 2004 incident, where the fire department was promptly notified, Bio-Lab failed to act appropriately on May 25, 2004 and notify the fire department in a prompt manner.  As a direct and proximate result of these failures, The Fire on May 25, 2004 reached catastrophic levels, destroying buildings and forcing an entire community to flee.

25.  As a direct result of The Fire and its aftermath, plaintiffs, and the Class they represent, have suffered damages in the past and/or into the foreseeable future, including personal injuries, emotional distress, fear and fright,  evacuation and inconvenience, property damage, loss due to negligent claims processing, special damages for past and future loss of income, special damages for business

13

interruption, special damages for out-of-pocket expenses, special damages for past and future cost of medical care and diagnostics, including medical monitoring in the future for latent diseases.

26.  Beginning almost immediately after The Fire started, Defendant Gallagher Bassett, as agent of Defendant Great Lakes and other Defendants, solicited and processed settlements of claims of persons affected by The Fire in a manner that was mistaken, negligent, and/or fraudulent, causing losses to the Plaintiffs and other Class members.

<u>ALLEGATIONS OF GREAT LAKES' CONTROL AND LIABILITY</u>

27.  Defendant Great Lakes, via its executive officer Defendant Bloom, and by other means, exercised such direct and dominant control over the Conyers facility where The Fire occurred that it is directly and entirely liable on all counts of this Complaint as the principal in an agency relationship with BioLab and/or with Gallagher Bassett.  The liability is grounded upon O.C.G.A. §§ 10-6-1 and 10-6-60, among other grounds.

28. Great Lakes' liability is grounded factually upon circumstantial and direct evidence of (a) Great Lakes' relations with BioLab before and after The Fire, (b) Great Lakes' and BioLab's conduct before and after The Fire, and (c) Great Lakes' ratification of relevant acts and/or omissions of Bloom, BioLab, and Defendant

14

Gallagher Bassett.

29. So dominant was Great Lakes' control of BioLab before and after The Fire that BioLab merely was Great Lakes' instrumentality and/or alter ego, performing no function other than functions serving the purposes of Great Lakes. BioLab exercised no identity or executive control separate and independent from Great Lakes, as demonstrated by Defendant Bloom's testimony and by circumstantial evidence, as follows in pertinent part:

a) BioLab did not observe corporate formalities, its bylaws in particular. <u>Compare</u> Schobel affid. ¶ 2 (cited Order, p. 5, March 30, 2007), <u>with</u> Bloom depo. Exh. 4 (bylaws, Bates page no. 001384), <u>and</u> Order, p. 4, March 30, 2007 (citing the bylaws);

b) BioLab's board of directors neither met nor deliberated. Bloom depo. at 173;

c) Defendant Bloom testifies that, in his capacity as an executive officer of Great Lakes, he ran Biolab merely as a division of Great Lakes. Bloom depo. at 44, 47-48, 178-79. Great Lakes considered BioLab merely a "division," he states. <u>Id.</u> at 178 ("The term consumer products division was the term Great Lakes used for BioLab.");

d) Bloom testifies that, in his executive position at Great Lakes, his simultaneous duties in charge of BioLab were the same as his responsibilities as a Great Lakes officer. Bloom depo. at 63, 178-79. He describes his responsibilities at that time at

Great Lakes and BioLab as "coterminus" and "synonymous." Id.

e)  Bloom, in his capacity as an officer of Great Lakes and BioLab, answered only to Great Lakes for the operations of BioLab, not also to BioLab, which lacked executive control other and higher than Bloom;

f)  Bloom was compensated with stock options and other benefits directly by Great Lakes.  Bloom depo. at 181-83; Transcript of Hearing, August 31, 2007, at (reporter's) pp. 37-40;

g)  Bloom's compensation and tenure as an officer of BioLab was fixed solely by Great Lakes, not by BioLab or not also by BioLab;

h)  Great Lakes, by controlling BioLab's finances, acted as BioLab's "bank."  Bloom depo. at 160;

i)  Great Lakes, exercising its discretion, took control of and siphoned all of BioLab's money after The Fire, indicating that Great Lakes, not BioLab, bore and paid the costs associated with the catastrophe;

j) Great Lakes negotiated and obtained the insurance against occurrence of The Fire, ousting BioLab in that matter;

k)  Great Lakes, as the insured, identified and treated the Conyers facility as its property;

l)  Great Lakes, in public filings with the U.S. Securities and Exchange Commission

("SEC"), declared that it initiated and controlled the claims solicitation and settlement activities which begin almost immediately with The Fire, which included the activities engaged in by Defendant Gallagher Bassett; and

m)   Great Lakes (and Chemtura by succession), in public filings with the SEC, declared that it owned (and owns) the insurance against occurrence of The Fire and reaped (and reaps) the insurance proceeds of the catastrophe.

30.   Great Lakes, immediately after The Fire, dramatically increased the amount of cash transfers to it from BioLab, raising an inference that it stripped BioLab of money to pay casualty losses of the catastrophe.  That same siphoning of assets demonstrates a lack of separateness between Great Lakes and BioLab.  It indicates that Great Lakes paid expenses related to the fire because it made and controlled decisions relevant to The Fire, beginning with insurance against its occurrence.

31.   The foregoing facts establish Great Lakes as the principal in agency relationships with BioLab and Gallagher Bassett, subjecting Great Lakes directly to liability for the neglect and fraud of its agents, pursuant to O.C.G.A. §§ 10-6-1 and 10-6-60.

32.   The foregoing facts satisfy the high quantum of evidence necessary to strip Great Lakes of any protection otherwise afforded it by BioLab's corporate veil.

17

Great Lakes is not shielded by that veil and, therefore, is entirely liable for every debt and liability otherwise arising against BioLab and/or for events at the Conyers facility.  However, the veil need not be pierced for Great Lakes to be liable directly as the principal in an agency with BioLab.  Defendant Bloom, by his admissions, possessed no more executive power at BioLab while he was its executive than he exercised for Great Lakes while he was the Great Lakes officer in charge of BioLab. The two responsibilities occurred simultaneously and were indistinguishable, synonymous, and coterminous.  Those facts and the others above show that BioLab was Great Lakes' agent, its servant, and its mere instrumentality.

33.  At all times pertinent hereto, Bloom, in his capacity as an executive officer of Great Lakes, was in charge of Great Lakes' specialty and/or consumer products division.  That division was BioLab, according to Great Lakes.  "The term consumer products division was the term Great Lakes used for BioLab." Bloom depo. at 178. That division was synonymous with BioLab at the time of the relevant events, according to Boom.  Id. at 178-79.  Bloom, as a Great Lakes officer, ran the division from the year 2000 until December, 2004, several months after The Fire.  Bloom depo. at 44, 47-48.  He was replaced at BioLab by Great Lakes in that final month of 2004, at which time he was promoted to a chief strategy position at Great Lakes.

34.  At all times pertinent hereto, Bloom, in his capacity as an executive officer

18

of Great Lakes, was the chief officer of BioLab, ultimately responsible for the safe operation and maintenance of all of BioLab's facilities, including the Conyers facility where The Fire occurred.  His responsibilities as the Great Lakes executive in charge of consumer or specialty products were the same as his responsibilities as the executive in charge of BioLab.  The two were coterminous and synonymous, Bloom admits.  Bloom depo. at 63, 178-79.

35.  On information and belief, Bloom's personal actions as an officer of Great Lakes, and/or his inactions in that same capacity, were a proximate cause of The Fire and its aftermath.  Specifically, for Great Lakes, he instituted no new, improved, and adequate safety precautions and procedures to prevent The Fire, despite learning in April, 2004, only several weeks before The Fire, of conditions and circumstances at the Conyers facility which warned him and Great Lakes of the likelihood of the catastrophe, including the likelihood of human injury.

36.  Bloom, in his capacity as an executive of Great Lakes, knew of the chemical instability of  calcium hypochlorite, trichloroisoeyanuric acid, dichloroisocyanuric acid and their propensity to cause fires; he knew that a standard sprinklered warehouse would not adequately suppress a calcium hypochlorite, trichloroisoeyanuric acid, and dichloroisocyanuric acid fire; that he had duty to see to it that the Conyers facility was safe; and that he had a duty to properly train

personnel with sufficient fire protection equipment for the chemicals stored there; and that he breached those and other duties.

37.  Bloom admits that, at the time of the events, he knew of the dangerous combustible properties of calcium hypochlorite, which is a primary chemical responsible for and involved in The Fire.  Bloom depo. at 100-04 & Exh. 3.

38.  Great Lakes is responsible for the negligence and other torts of its employee Bloom under O.C.G.A. § 51-2-2.  That is an additional ground for holding Great Lakes directly and fully liable on all counts of this Complaint.

39.  Chemtura, in its most recent public filing with the SEC, acknowledges its potential liability as Great Lakes' successor for claims arising from The Fire. Chemtura holds itself out as Great Lakes' successor.  It is the merged entity in which Great Lakes' assets, rights, interests, and liability inhere, including ownership of the insurance proceeds from the catastrophe – a fact Chemtura acknowledges in the same public filing with the SEC.

## COUNT ONE - NEGLIGENCE

40.  Plaintiffs hereby adopt by reference all allegations of law and fact pled in the Complaint.

41.  Defendants had a duty to conduct their operations in a safe manner and to maintain their premises in a safe condition, so as to prevent and/or suppress fires

20

Case 1:05-cv-00835-CC   Document 228   Filed 04/06/07   Page 21 of 47

in their warehouses.

42.   On information and belief, Defendants knew, as early as 2000, that calcium hypochlorite, trichloroisoeyanuric acid, and/or dichloroisocyanuric acid have a well-documented history of hyper-reactivity to contaminants and/or heat, which may result in a strongly exothermic reaction, and that these chemicals will rapidly accelerate combustion, creating their own oxygen, until the fuel is consumed.

43.   On information and belief, Defendants knew, as early as 2000, that a standard warehouse sprinkler system, even one that complied with national, state and local fire codes, would not adequately suppress a calcium hypochlorite, trichloroisoeyanuric acid, or dichloroisocyanuric acid accelerated fire.

44. Defendants breached their duties in the following, non-exclusive respects: a)  improperly storing large amounts of calcium hypochlorite, trichloroisoeyanuric acid, dichloroisocyanuric acid, combustibles and other hazardous chemicals, in close proximity;

b)   failing to properly store calcium hypochlorite, trichloroisoeyanuric acid, dichloroisocyanuric acid, combustibles, and other hazardous chemicals, in a safe manner;

c) failing to prevent contamination of the calcium hypochlorite, trichloroisoeyanuric

acid, and/or dichloroisocyanuric acid so as to prevent fire;

d) failing to keep heat sources away from the calcium hypochlorite, trichloroisoeyanuric acid, and/or dichloroisocyanuric acid so as to prevent fire;

e) failing to provide adequate fire protection equipment to suppress and/or control a calcium hypochlorite, trichloroisoeyanuric acid, and/or dichloroisocyanuric acid accelerated fire;

f) failing to properly design and/or maintain their warehouse in such a manner as to adequately protect against fires;

g) failing to properly inspect their warehouse and its contents to prevent The Fire;

h) failing to properly train personnel to inspect and/or store the hazardous chemicals that burned in The Fire;

i) failing to properly supervise personnel to prevent The Fire;

j) failing to properly train personnel in firefighting techniques;

k) failing to keep a sufficient number of trained personnel on the job at all times in order to prevent and/or put out The Fire before it got out of control;

l) failing to conduct and/or properly conduct and/or properly implement a process hazard analysis of the Conyers facility;

m) failing to properly process, store, and handle the hazardous chemicals and other combustibles at the Conyers warehouse in order to prevent fires;

n) failing to promptly notify the fire department and other disaster response agencies of the outbreak of The Fire on May 25, 2004; and

o) any other actions or inactions which may be discovered and proven at trial.

45.   As a proximate result of the foregoing, plaintiffs and the Class have suffered the damages described above.

46.   In the alternative, the damages to plaintiffs would not have normally occurred if Defendants, who were responsible for the ownership, control, manufacture, processing, packaging, use, storage, inspection and/or handling of the hazardous chemicals in the Conyers warehouse, had exercised the high degree of care placed upon them by law in the discharge of these duties, the specific failure of which plaintiffs may not be able to prove, but which was and is within the knowledge of Defendants, and which leads to no other conclusion than that Defendants were at fault. Therefore, plaintiffs plead application of the doctrine of res ipsa loquitur as to Defendants Bio-Lab, Great Lakes, Chemtura (as successor of Great Lakes), and Bloom.

47.   On information and belief, Defendants breached state and/or local laws and/or regulations governing their manufacture, processing, packaging, use, storage, inspection and/or handling of hazardous materials, which were designed to specifically protect against occurrences such as The Fire, and which were

specifically designed to protect the Plaintiffs and the Class against the damages they suffered from The Fire. Because these laws and/or regulations impose a fixed duty of care, and because Defendants breached that duty, Defendants are guilty of negligence per se.

<u>COUNT TWO - STRICT LIABILITY</u>

48.  Plaintiffs hereby adopt by reference all allegations of law and fact pled in the Complaint.

49.  Defendants have caused to be brought into the State of Georgia, and/or have created in the State of Georgia, hazardous, toxic substances, including trichloroisocyanuric acid, dichloroisocyanuric acid, and calcium hypochlorite.

50.  Defendants had exclusive custody of said toxic substances, and had complete control over the manufacture, processing, packaging, use, storage, inspection and/or handling of these dangerous materials.

51.  Defendants' activities with respect to the manufacture, processing, packaging, use, storage, inspection and/or handling of said toxic materials constitute "ultrahazardous" or "inherently dangerous" activities similar to blasting or the use of explosives.

52.  On information and belief, Defendants' ultra-hazardous activities in the manufacture, processing, packaging, use, storage, inspection and/or handling of

24

said toxic materials were a direct and proximate cause of The Fire and, as such, Defendants are strictly and absolutely liable to plaintiffs and the Class for all the damages suffered by them, as set forth above.

<u>COUNT THREE - NUISANCE</u>

53. Plaintiffs hereby adopt by reference all allegations of law and fact pled in the Complaint.

54. The Fire, and the resulting release of toxic chemicals into the air and water, constitute a public and private nuisance in that they impaired the Plaintiffs and the Class in particular, and the public in general, from the enjoyment and free use of their homes and property.

55. This nuisance was caused by the Defendants' habitual improper manufacture, processing, packaging, use, storage, inspection and/or handling of hazardous materials on their property which has caused toxic releases in the past, which caused The Fire, and which continued to emit toxic chemicals into the air and water, which annoys, inconveniences, endangers, and disturbs the Plaintiffs, the Class, and the public in general, in their health, safety, and comfort of their homes and property.

<u>COUNT FOUR - TRESPASS</u>

56. Plaintiffs hereby adopt by reference all allegations of law and fact pled in

25

the Complaint.

57.  On information and belief, Defendants intentionally stored, processed, inspected, and/or handled hazardous materials in such a way that The Fire would inevitably occur, resulting in toxic, hazardous chemicals entering, via air and water, upon land, in the legal ownership and/or possession of the plaintiffs and the Class, thereby making Defendants liable for trespass, without proof of actual harm.

58.  Alternatively, Defendants recklessly or negligently caused toxic, hazardous chemicals entering, via air and water, upon land, in the legal ownership and/or possession of the plaintiffs and the Class, causing harm to the land, thereby making Defendants liable for trespass.

## COUNT FIVE – MUTUAL MISTAKE

59.  Plaintiffs hereby adopt by reference all allegations of law and fact pled in the Complaint.

60.  This Count applies only to those Plaintiffs including Ms. Parham and Mr. Holt and Class members who received checks from Defendant Gallagher Bassett acting for itself and in its capacity as agent of the other Defendants.  The number of checks and check recipients at issue exceeds one thousand.

61.  The checks at issue have printed upon them release language that declares the checks to be full and final releases of any claim and all claims.  That language is

a mutual mistake.  It appears on the checks due to a scrivener error, as further shown below.

62.   Defendant Gallagher Bassett admits that it issued as many as sixteen hundred of the mistaken checks.  Each mistaken check bears only the name of Defendant Gallagher Bassett as a payer, not also the name of any other Defendant. Gallagher Bassett is an indispensable party for relief for that reason, among others.

63.   Beginning on May 25, 2004, Gallagher Bassett, as claim processor and agent of the other Defendants, communicated with Plaintiffs and the Class members regarding compensation for certain expenses and inconvenience suffered as a consequence of the catastrophe that started on May 25, 2004 (The Fire).

64.   In those discussions, the Defendants including Gallagher Bassett represented to Plaintiffs and the Class members that the Defendants would provide compensation for inconvenience experienced as a result of the Fire.  The Defendants including Gallagher Bassett also offered such payments as gratuities, specifically to (according to the Defendants) sow goodwill among those receiving the checks.

65. In their communications to Plaintiffs and the Class members, Defendants and their agents, including but not limited to Gallagher Bassett, represented to Plaintiffs that any payment to them by the Defendants would not act as a release or waiver of any claim Plaintiffs and the Class members might have for personal injury

or any other injuries.

66. Contrary to Defendants' and Plaintiffs' understanding and agreement, by mutual mistake of the parties, checks issued to Plaintiffs and the Class erroneously included language purporting to release any claim and all claims arising from The Fire.  This language was placed upon the checks due to a scrivener error.

67. In the case of Ms. Parham and all persons similarly situated to her, the mutual mistake occurred as follows: (a) Shortly after May 25, 2004, a claims adjuster employed by Gallagher Bassett – Mr. Cantrell – contacted Ms. Parham and offered her $75.00 (seventy-five dollars) for her inconvenience.  (b) Ms. Parham agreed to accept that sum of $75.00 as long as her acceptance of it did not effect any release of her claims.  (c)  Defendants sent Ms. Parham a check for $75.00 which had printed on it the words "Full and Final Settlement of Any and All Claim."  (d)  Neither Ms. Parham nor Mr. Cantrell, nor any Defendant, intended for the $75.00 check to Ms. Parham to release any of her claims.  (e)  The offending language on the check to Ms. Parham was mistakenly printed on it contrary to the intent of all parties.  (f) Gallagher Bassett subsequently admitted the mistake and attributed it to a scrivener error.

68. Plaintiff Parham and other members of the Class such as Gina Delacoudray did not cash the checks because of the mistaken release language on

them.

69. Defendant Gallagher Bassett agrees with the Plaintiffs and admits that the release language was printed on the checks by mistake and is unenforceable as a release for that reason. Transcript of Hearing, August 31, 2007, at (reporter's) pp. 42-43.

70. The other Defendants (including Chemtura by succession of Great Lakes) contend in opposition to the Plaintiffs (and to Gallagher Bassett) that in all cases, including the cases of Plaintiff Parham and those Class members like her who did not cash the checks because of the mutual mistake, the checks are enforceable as partial releases, or releases to the extent of the amount of each check.

71. The other Defendants (including Chemtura by succession of Great Lakes) contend in opposition to the Plaintiffs (and to Gallagher Bassett) that the mistaken language on the checks acts as a complete release in cases such as Plaintiff Holt, who received one or more of the checks and cashed them.

72. When the checks were issued and received, all parties, including Defendants, Plaintiffs, and other Class members who received the checks, were reasonably of the belief the checks did not release the Defendants from any claims. That was the actual agreement and intent of the parties.

73. In June, 2004, within two weeks of the extinguishment of The Fire,

Defendant BioLab stated to Hon. David Irwin of the Superior Court of Rockdale County, Georgia, that the release language was mistakenly printed on the checks. However, since that time, down to today, BioLab and the Defendants other than Gallagher Bassett have not honored the promise BioLab made at that time to Judge Irwin not to enforce as a release any instrument other than a form prescribed and approved for that purpose in judicial proceedings involving The Fire.

74.  The Defendants have refused to cure the mistaken checks and have not notified check recipients of the mistaken release language on the checks.  The Defendants have ratified the mistake for their own benefit, specifically to (a) prevent recipients of learning of the error, (b) create and continue among recipients a mistaken and improper impression that the recipients' claims have been extinguished, and (c) enforce the mistaken checks against the Plaintiffs and the Class, either or both as partial releases or as full releases.

75.  Plaintiffs and Class members have been injured by the mutual mistake and by the Defendants' efforts to ratify and exploit the mistake for their benefit. Those injuries continue and exist today.

76.  When the Defendants solicited the Plaintiffs and the Class for the apparent purposes of goodwill and compensation – the result of which is the mistaken checks – the Defendants were aware of class action lawsuits which had

30

been filed on behalf of all persons affected by the Fire, including (and especially) the persons the Defendants subsequently sent the mistaken checks. Thus, the Defendants' ratification of the mistaken checks for their benefit is intended to reduce the number of potential claimants and the amount of claims in any lawsuit arising from The Fire.

77. The matter of the mutually mistaken checks is controverted for the reasons above, including as between Defendants (Gallagher Bassett versus the other Defendants).

78. Plaintiffs Parham and Holt and affected Class members, therefore, demand reformation of all checks to delete the mutually mistaken release language printed on the checks, to evidence and fulfill the parties' intentions. Reformation is a remedy provided in cases of mutual mistake by O.C.G.A. §§ 23-2-21 and 23-2-31.

79. Plaintiff Parham and affected Class members, therefore, demand monetary relief incidental to reformation to ensure they receive the sum of any check they received but did not cash because of the mutual mistake. Such incidental monetary relief is appropriate for a sub-class certified under Fed.R.Civ.P. 23(b)(2).

80. Under O.C.G.A. § 13-5-4, no check containing the mutual mistake is enforceable as a contract of any kind, including as a release, partial release, or release to the extent of the amount of the check.

## COUNT SIX – FRAUD

81.  Plaintiffs hereby adopt by reference all allegations of law and fact pled in the Complaint.

82.  This count of fraud is grounded upon O.C.G.A. §§ 23-2-53 and 13-3-46. It is asserted for those Plaintiffs and other Class members who signed a release form or other similar contract at the behest of the Defendants, and for the Defendants' benefit, including Great Lakes (Chemtura by succession), BioLab, and/or Gallagher Bassett, and/or any other claims processor or agent retained by or for Defendants.

83.  The particular circumstances of the release the Defendants obtained from Plaintiff Holt, together with the gross inadequacy of the consideration given for that release, constitute fraud within the meaning of O.C.G.A. § 23-2-53.

84.  Defendants obtained a release from Mr. Holt for no more than one percent of the cost and medical debt he incurred for treatment of the injuries he suffered from The Fire.  The release states that it is given in return for a payment of $152.00 (one hundred and fifty-two dollars).  That payment is so grossly inadequate that it is evidence of fraud within the meaning of O.C.G.A. § 13-3-46.

85.  The release the Defendants obtained from Mr. Holt runs in favor only of Defendant BioLab, not also the other Defendants, who are not named in the release. It was obtained from Mr. Holt while Gallagher Bassett operated, as agent of the

other Defendants, the claims solicitation activities commencing with The Fire.

86.  Defendants fraudulently and systematically suppressed material facts in their solicitation of settlements and releases from Plaintiff Holt and members of the Class.  The release form they instructed Mr. Holt to sign does not inform him of a right to the advice of attorneys or physicians, and it purports to effect a general waiver and release by him of claims for injuries the nature and severity of which were unknown and unknowable to him at the time the release was obtained.

87.  The Superior Courts of Fulton County, Georgia, and Rockdale County, Georgia, in proceedings on the release form the Defendants instructed Mr. Holt to sign, found that the form was and would be improper because it failed to inform the releasing party of the right to consult an attorney and/or physician, and because it purported to effect a general waiver and release of claims for injuries the nature and severity of which are or were unknown and unknowable to the releasing party.

88.  The judges presiding in the aforementioned proceedings ordered that the release form the Defendants instructed Mr. Holt to sign be changed to cure and eliminate the material omission and material impropriety described.

89.  Defendant BioLab, in a proceeding before the Superior Court of Rockdale County, Georgia, declared in June, 2004, that it would not utilize any release except in the form prescribed and approved in judicial proceedings arising from The Fire.

33

90.  The release the Defendants obtained from Mr. Holt in June, 2004, is not the form prescribed and approved by the Superior Courts of Fulton County, Georgia, and Rockdale County, Georgia, in proceedings arising from The Fire.  That fact is particular circumstance of fraud within the meaning of O.C.G.A. § 23-2-53.

91.  Mr. Holt, at the time of his exposure to chemicals released by The Fire, lacked knowledge of the nature, severity, and latency of injuries caused by that exposure.

92.  Mr. Holt, at the time the Defendants obtained his release, lacked knowledge of the nature, severity, and latency of injuries caused by his exposure to chemicals released by The Fire.

93.  Defendants did not inform Mr. Holt of any of the above material facts of his exposure to the chemicals released by The Fire.  When they solicited and obtained a release from him, they withheld that information from him, a particular circumstance of fraud within the meaning of O.C.G.A. § 23-2-53.

94.  Upon information and belief, Defendants developed and systematically used a set script or scripts which they issued to their representative to use in their solicitation of settlements and releases from Mr. Holt and the Class members.

95.  Upon information and belief, Defendants intentionally withheld from the scripts any mention of future health risks of exposure to chlorine or any other

chemical released by The Fire.

96.   Upon information and belief, Defendants intentionally instructed their representatives to remain silent about the nature and dangers of chemical exposure associated with The Fire, especially when asked about such dangers by persons whom the Defendants solicited for settlement.

97.   Upon information and belief, Defendants instructed their representatives to remain silent about the existence of any class action lawsuits filed in this matter, and in which Mr. Holt and other Class members might be compensated, when they discussed settlement with Mr. Holt and the Class members.

98.   In withholding and suppressing the above material facts, the Defendants deceived and misled Mr. Holt and the Class members into believing there were no significant future dangers from their chemical exposure.  The deceit benefitted the Defendants financially by dramatically reducing the amount of consideration they gave in return for releases they solicited and obtained.   It was intended to compromise claims for grossly inadequate sums.  It was intended to prevent Mr. Holt and other persons so exposed from joining in a class action lawsuit.  It was conducted pursuant to a single common scheme to defraud.

99. Defendants' representatives followed Defendants' guidance and, in every circumstance, when speaking with Mr. Holt and the Class members, acted and

represented things as alleged in this count, pursuant to the instructions provided to them.

100.  Specifically, in the case of Mr. Holt, Defendants' representatives did as follows: (a) Early in June, 2004, shortly after extinguishment of The Fire, while Gallagher Bassett acted as agent of the other Defendants, a claims adjuster employed by the Defendants contacted Mr. Holt at Mr. Holt's place of employment.  (b) The adjuster gave Mr. Holt one or more checks containing release language mistakenly placed on the check(s) by scrivener error.  (c) The adjuster instructed Mr. Holt to sign a release in return for the payment.  (d)  Mr. Holt accepted the payment and signed the release.  (e) The release is not – as averred – in the form prescribed in judicial proceedings arising from The Fire.

101.  The release form Mr. Holt signed purports to release substantially all claims, past, present, and future, that he might have against Defendant BioLab.  It purports to release any injury unknown or unknowable to him at the time of signing.

102.  Prior to presenting the release, and upon presentment of the release, the claims adjustor who contacted Mr. Holt did not tell Mr. Holt about class action lawsuits pending at that time in connection with The Fire, all of which lawsuits were known to the Defendants and their agents at that time, including the adjuster who

contacted Mr. Holt.

103.  Prior to presenting the release, and upon presentment of the release, the claims adjustor who contacted Mr. Holt did not tell Mr. Holt about the health risks the Defendants knew to be associated with exposure to the chemicals released by The Fire.

104.  Defendants had a duty to reveal to Plaintiffs, including Mr. Holt and Class members similarly situated to him, the dangers and future health affects of chlorine and chemical exposures associated with the toxic plume of The Fire, as well as a duty to reveal the existence of pending class actions in which Mr. Holt and the others might be compensated.  Defendants breached those duties.

105.  Defendants had a duty to inform Plaintiffs, including Mr. Holt and Class members similarly situated to him, of their right to consult an attorney and/or physician about the release form the Defendants instructed the persons to sign, and about the dangers and future health affects of chlorine and chemical exposures associated with the toxic plume of The Fire.  Defendants breached those duties.

106.  The above duties of the Defendants also arose from their superior knowledge of the above material facts.  That superiority was great in comparison to Mr. Holt's lack of knowledge and that of Class members similarly situated to him. That gross disparity in knowledge operated against Holt and the others in the Class,

as shown in part by the aforementioned findings of courts in Fulton County and Rockdale County. The Defendants were aware of their superior knowledge and exploited it, which are particular circumstances of fraud within the meaning of O.C.G.A. § 23-2-53.

107. Mr. Holt and other Class members who signed personal injury releases in the form presented to them by the Defendants reasonably relied on Defendants' representations and omissions. The Defendants' silence on the material facts described above induced and influenced Mr. Holt and other Class members to sign the release forms in return for grossly inadequate consideration.

108. Mr. Holt and similarly situated Class members have suffered significant personal injuries that were undiscovered or latent, or not fully discovered and known, at the time they signed the releases. Their rights were covertly extinguished by Defendants, and the Defendants engaged in fraudulent suppression which misled and injured Mr. Holt and the others in the amounts of additional injuries not contemplated or compensated in the settlements which the releases purport to effect. Those injuries are foreseeable and intended consequences of the fraudulent suppression.

109. Accordingly, this cause of action for fraud sounds in tort, and on the basis of it, Mr. Holt and Class members similarly situated demand compensatory

and punitive damages against the Defendants.

## COUNT SEVEN - PUNITIVE DAMAGES

110.  Plaintiffs hereby adopt by reference all allegations of law and fact pled in the Complaint.

111.   On information and belief, in April, 2004, Defendants had an unauthorized release of toxic trichloroisocyanuric acid, which was being investigated by the U.S. Environmental Protection Agency (E.P.A.) for violations. On information and belief, Bio-Lab had been cited previously by the E.P.A. for similar violations.

112.   Defendants knew of the hazards attendant to the manufacture, processing, packaging, use, storage, inspection and/or handling of the dangerous chemicals stored at their Conyers warehouse, and knew that exposure to these chemicals and/or their pyrogenic by-products involved a serious risk of personal injury to persons, and damage to property.

113.  In spite of Defendants' knowledge of the fire hazards associated with calcium hypochlorite, dichloroisocyanuric acid, and trichloroisocyanuric acid and, their knowledge of the health and property damage risks involved, and their prior history of unauthorized toxic releases, Plaintiffs are informed and believe that Defendants intentionally, or with wanton and reckless disregard for the public

safety, failed to take protective measures in their Conyers warehouse to prevent The Fire from occurring in the first place and/or intentionally, or with wanton and reckless disregard for the public safety, failed to implement safety procedures and/or devices to suppress or control The Fire.

114.  As a result of the foregoing intentional or wanton and reckless conduct by Defendants, The Fire occurred, causing extensive damages to the Plaintiffs and the Class.

115.  Plaintiffs specifically allege that the manufacture, processing, packaging, use, storage, inspection and/or handling of the dangerous chemicals at Defendants' Conyers warehouse was done in such a way as to evince a reckless disregard for the public safety in general and for the Plaintiffs and the Class in particular, and Plaintiffs specifically allege that such conduct subjects Defendants to absolute liability and punitive damages.

## COUNT EIGHT - ATTORNEYS FEES

116.  Plaintiffs hereby adopt by reference all allegations of law and fact pled in the Complaint.

117.  On information and belief, the foregoing wrongful acts of Defendants were in bad faith, obliging Defendants to pay Plaintiffs' attorneys fees and expenses of this litigation pursuant to Georgia Code § 13-6-11.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, for themselves, and for all those similarly situated, pray for the following relief against Defendants:

1.  That, as soon as practicable, the Court certify this action as a class action;

2.  That the Court adjudge and declare pursuant to O.C.G.A. § 13-5-4 that every check received but uncashed due to mutual mistake is unenforceable as a release, partial release, and/or release to the extent of the amount of each check;

3.  That the Court reform all checks to cure the mutually mistaken language of release printed upon them;

4.  That the Court order re-issued as reformed any check received but uncashed due to mutual mistake, or award incidental monetary relief to the persons adversely affected by the mutual mistake, as allowed for a sub-class certified under Fed.R.Civ.P. 23(b)(2).

5.  That there be a trial by jury on all issues in this case allowed by law;

6.  That there be judgment in favor for the Plaintiffs, and the Class so certified, and against the Defendants Great Lakes, BioLab, Chemtura, Gallagher Bassett, and Larry Bloom, jointly and severally, for the full amount of damages suffered by Plaintiffs and the Class, including, but not limited to, compensatory damages in amounts proven at trial;

7.  That there be judgment for punitive damages in favor of each Plaintiff and for the entire Class in the utmost amounts allowed by law;

8.  That there be judgment in favor of Plaintiffs and the Class against the Defendants, jointly and severally, for legal interest, court costs, attorneys fees and expenses, as allowed by law; and

9.  For all other legal and equitable relief, including, but not limited to, medical monitoring, declaratory judgment, and injunctive relief as the Court deems equitable and just.

<u>LOCAL RULE 7.1 (D) CERTIFICATION</u>

The undersigned counsel for Plaintiffs hereby certifies that the foregoing Third Amended Class Action Complaint For Damages and For Declaratory Judgment has been prepared in accordance with one of the fonts (Book Antigua) and point selections (13 pt) approved by the Court in Local Rule 5.1(B) and (C).

s/ W. Lewis Garrison, Jr.
W. Lewis Garrison, Jr.

Respectfully submitted, this 6th day of April, 2007, by:

s/ W. Lewis Garrison, Jr.
W. Lewis Garrison, Jr. (GA Bar No.286815)
Counsel for Plaintiffs

42

HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL  35203
Telephone: (205) 326-3336
Facsimile: (205) 326-3332

Of Counsel:

Roger W. Orlando (GA Bar. No. 554295)
THE ORLANDO FIRM
315 West Ponce de Leon Ave.
Suite 400
Decatur, GA 30030
Telephone:  (404) 373-1800

Barry G. Reed (AZ Bar No. 020906)
ZIMMERMAN REED, PLLP
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ  85254
Telephone:  (480) 348-6400
Facsimile: (480) 348-6415

M. David Karnas (AZ Bar No. 013728)
BELLOVIN & KARNAS, P.C.
131 East Broadway Boulevard
Tucson, Arizona 85701
Telephone: (520) 571-9700
Facsimile: (520) 571-8556

Seth Cortigene (TX Bar No. 04846200)
THE CORTIGENE LAW FIRM
1200 State Highway 146 South, Suite 190
LaPorte, TX  77571
Telephone: (281) 867-4884
Facsimile: (281) 867-4886

Newton B. Schwartz, Sr. (TX Bar No. 17869000)

Law Office of Newton B. Schwartz, Sr.
1911 Southwest Freeway
Houston TX 77098
(713) 630-0708 Tel
(800) 536-6006 toll
(713) 630-0789 Fax


**Defendant Chemtura Corporation may be served at:**

**Corporation Service Company**
**40 Technology Pkwy. South, # 300**
**Norcross GA 30092**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Bill Martin, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE NO. |
| | ) | 1:05-CV-835-CC |
| | ) | |
| vs. | ) | |
| | ) | CERTIFICATE OF SERVICE |
| Bio-Lab, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

I hereby certify that on April 6, 2007, I electronically filed the foregoing with the Clerk of Court using the EM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

John J. Dalton
Kevin A. Maxim
Merle R. Arnold, III
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta GA 30308-2216

Matthew F. Barr
Hawkins & Parnell, LLP
4000 SunTrust Plaza
303 Peachtree Street, NE
Atlanta GA  30303

Roger W. Orlando
THE ORLANDO FIRM
315 West Ponce de Leon Ave.
Suite 400

Decatur, GA 30030

Barry G. Reed
Zimmerman Reed PLLP
14646 N Kierland Blvd. Suite 145
Scottsdale AZ  85254

M. David Karnas
Bellovin & Karnas, P.C.
131 E. Broadway
Tucson AZ 85701

s/ W. Lewis Garrison, Jr.

  I hereby certify that I have mailed by United States Postal Service the same document this same day to the following non-EM/ECF participants:

William F. Kiniry, Jr.
DLA Piper Rudnick Gray Cary US LLP
Suite 4900
1650 Market Street
Philadelphia PA 19103

Seth Cortigene
The Cortigene Law Firm
Suite 190
1200 State Highway 146 South
LaPorte TX 77571

John C. Dougherty
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore MD 21209-3600

Newton B. Schwartz, Sr.
Law Office of Newton B. Schwartz, Sr.
1911 Southwest Freeway

Houston TX 77098

Chemtura Corporation
199 Benson Road
Middlebury CT 06749

                                        s/ W. Lewis Garrison, Jr.